UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 13-1849

PAUL H. FELDMAN,

              Plaintiff - Appellant,

       and

MARTIN L. PERRY,

              Plaintiff,

       v.

LAW ENFORCEMENT ASSOCIATES CORPORATION; ANTHONY RAND;
JAMES J. LINDSAY; JOSEPH A. JORDAN; PAUL BRIGGS,

              Defendants – Appellees,

       and

JOHN H. CARRINGTON,

              Defendant.

Appeal from the United States District Court for the Eastern
District of North Carolina, at Raleigh.  W. Earl Britt, Senior
District Judge.  (5:10-cv-00008-BR)

Argued:  March 18, 2014                    Decided:  May 12, 2014

Before GREGORY, WYNN, and THACKER, Circuit Judges.

Affirmed by published opinion.  Judge Gregory wrote the opinion,
in which Judge Wynn and Judge Thacker joined.

**ARGUED:** Adam Augustine Carter, EMPLOYMENT LAW GROUP, PC, Washington, D.C., for Appellant. Amy Yager Jenkins, MCANGUS, GOUDELOCK & COURIE, LLC, Mount Pleasant, South Carolina, for Appellees. **ON BRIEF:** R. Scott Oswald, John T. Harrington, Jr., EMPLOYMENT LAW GROUP, PC, Washington, D.C.; Michael C. Byrne, LAW OFFICES OF MICHAEL C. BYRNE, PC, Raleigh, North Carolina, for Appellant. Helen F. Hiser, Mount Pleasant, South Carolina, for Appellees.

———————

GREGORY, Circuit Judge:

Plaintiff Paul Feldman, who asserts that he was unlawfully terminated from his employment in retaliation for protected activity under the Sarbanes-Oxley Act of 2002 ("SOX"), 18 U.S.C. § 1514A, appeals the district court's grant of summary judgment to Defendants Anthony Rand, James Lindsay, Joseph Jordan, Paul Briggs, and Law Enforcement Associates Corporation ("LEA"). Because we find that Feldman failed to sufficiently establish that his alleged protected activities were a contributing factor to his termination, we affirm.

I.

Sometime prior to 2001, Feldman became President of LEA, a company that manufactures security and surveillance equipment.[1] He remained President and CEO until his termination on August 27, 2009. In 2005, LEA's founder, John Carrington, pled guilty to criminal export violations involving another company he owned, and was ordered to refrain from certain export activities for five years. Though Carrington remained a major stockholder, he resigned from LEA's Board of Directors ("Board") and has not

---

[1] We resolve any factual disputes and competing, rational inferences in the light most favorable to Feldman, as the party opposing summary judgment. Rossignol v. Voorhaar, 316 F.3d 516, 523 (4th Cir. 2003).

3

been an officer or employee of LEA since. During the relevant time period, the Board consisted of two "Inside Directors" — Feldman and Martin Perry — and three "Outside Directors" — Rand, Lindsay, and Jordan.

Since at least November 1, 2007, an "extraordinarily palpable" split existed between the Inside Directors and the Outside Directors, J.A. 4282, due in some part to the fact that Carrington planned to sell LEA without first giving Feldman an opportunity to buy it, as well as the Board's decision not to approve a written employment contract that would have increased Feldman's salary. The tension deepened after Feldman confirmed in December 2007 that Carrington owned fifty percent of a company called SAFE Source, to which LEA had shipped some of its products in 2005 or 2006. SAFE Source exported these products overseas, but because Carrington was still banned from making exports, Feldman became concerned that the exports were illegal.

The issue of LEA's business with SAFE Source arose in a December 27, 2007 Board meeting, but the parties dispute exactly what was said and by whom. There are competing versions of the meeting minutes, but a majority of the Board — the Outside Directors — adopted the version produced by Mark Finkelstein, a lawyer Rand hired for the company, over the version produced by Eric Littman, another LEA attorney. Feldman asserts that he objected that Finkelstein's minutes were falsified. Feldman

4

further contends that he saw Rand and Finkelstein meet with Carrington immediately after the meeting, and suspects that they informed Carrington of his intention to report the issue to the government.  On January 14, 2008, Feldman and Perry wrote the United States Department of Commerce about the potentially illegal exports, resulting in a federal investigation and a raid of SAFE Source's headquarters shortly thereafter.

A number of other conflicts subsequently arose between Feldman and Appellees.  In February or March 2008, Feldman relocated LEA's headquarters from Youngsville, North Carolina to Raleigh, North Carolina, claiming that it benefitted the company in various ways.  The Outside Directors viewed this act as insubordinate since Feldman entered the new lease on office space without their prior approval.  At some point in 2008, the Outside Directors also took issue with the financial information and meeting agendas they received from Feldman, asserting that the requested information was either not provided or was insufficient.  At a March 13, 2008 Board meeting, Finkelstein became LEA's primary counsel, while Littman remained on as LEA's securities counsel.  Finkelstein submitted various bills for his legal services on May 1, 2008, but Feldman considered them fraudulent because they were for services rendered prior to March 13, 2008, and he refused to pay.

In April 2009, Feldman and other LEA representatives met with Joseph and Barbara Wortley, LEA shareholders who were threatening to sue LEA over a contractual dispute. When Joseph Wortley expressed dissatisfaction with the Board, Feldman replied that the Board "could do more to help the company," and that "he too wished they would do more." J.A. 4285. At a July 27, 2009 meeting with Joseph Wortley and Wortley's son, Feldman further stated that the Outside Directors were loyal to Carrington rather than to the company. Shortly after this meeting, Feldman wrote a letter to the Outside Directors urging them to resign from the Board. Lastly, in July or August 2009, Feldman and Perry reported to the Department of Commerce their suspicion that LEA was involved in insider trading because several prominent North Carolina politicians were shareholders.

On August 26, 2009, Rand told Perry that the Outside Directors planned to terminate Feldman at the Board meeting scheduled for the next day because they had lost confidence in him and because of the Wortley situation. However, Rand told Perry that the Outside Directors wanted Perry to stay on at LEA. Perry advised Feldman of the conversation, and neither he nor Feldman attended the August 27, 2009 Board meeting. Feldman's

employment was terminated at that meeting, and Perry's employment was terminated on September 23, 2009.[2]

Feldman asserts that in the months just prior to his termination, he successfully led negotiations to secure a $225 million contract with the Department of Homeland Security ("DHS"), and that, only ten days before firing him, LEA reported record income and a 260% increase in sales. Appellees counter that the substantive work on the DHS contract was done by another employee, and that LEA had record income in 2009 only because they unexpectedly received an unsolicited job from the Census Bureau worth roughly $7.3 million. Aside from this particular contract, Appellees claim LEA was a break-even business that was not doing well during the last years of Feldman's leadership.

Feldman filed suit against LEA, Rand, Lindsay, Jordan, and Carrington on January 8, 2010, asserting a claim under the Americans with Disabilities Act ("ADA") as well as state claims

---

[2] After learning of his pending termination, Feldman went to the hospital on August 26, 2009 claiming that he might be having a transient ischemic attack. Perry, who had a history of multiple sclerosis, went to the hospital on August 27, 2009, where he was diagnosed as having suffered an acute multiple sclerosis flare. Perry did not return to work thereafter, and when he failed to respond to LEA's inquiries about when he would return, LEA sent him a letter on September 23, 2009 stating that they had to conclude from his lack of response that he had voluntarily quit.

7

for civil conspiracy and wrongful termination. Perry had sued separately, and they consolidated their complaints on April 16, 2010. On June 7, 2010, Feldman and Perry amended the complaint,[3] adding their respective SOX claims that had since become ripe. The court granted in part and denied in part a motion to dismiss, and all that remained at issue was their ADA and SOX claims, Perry's state law claims, and a counterclaim by LEA.

Feldman argues that he was unlawfully fired in retaliation for engaging in activities protected under SOX between late December 2007 and early May 2008. These activities include: (1) reporting to the Board and the federal government about the potentially illegal exports with SAFE Source; (2) objecting to falsified Board meeting minutes; (3) objecting to leaks of information by the Outside Directors to Carrington; (4) objecting to and refusing to pay Finkelstein's legal bills; and (5) notifying the government of suspected insider trading.

The district court granted summary judgment to Appellees and held that plaintiffs failed to make a prima facie showing of their SOX claims because they did not sufficiently prove that the alleged protected activities[4] were a contributing factor to

_____

[3] The amended complaint also added Briggs as a defendant. On March 10, 2011, Carrington was dismissed as a defendant.

[4] The court held that plaintiffs had not sufficiently shown that their report of suspected insider trading was protected (Continued)

8

their respective terminations. The court therefore found that it need not decide whether LEA could show that it would have terminated Feldman and Perry otherwise, but noted that LEA had a legitimate business reason for its actions. Feldman timely appealed, arguing that the court erred by holding that the activities were not contributing factors to his termination and by failing to decide whether Appellees had sufficiently shown that he would have been fired regardless. This Court has jurisdiction pursuant to 28 U.S.C. § 1291.

## II.

The Sarbanes-Oxley Act protects whistleblowers of publicly-traded companies by prohibiting employers from retaliating against employees who have provided information about potentially illegal conduct. Welch v. Chao, 536 F.3d 269, 275 (4th Cir. 2008). SOX specifically provides that:

> no [publicly traded] company, or any officer [or] employee . . . of such company . . . may discharge . . . an employee . . . because of any lawful act done by the employee . . . to provide information . . . or otherwise assist in an investigation regarding any conduct which the employee reasonably believes constitutes a violation of section 1341 [mail fraud], 1343 [wire fraud], 1344 [bank fraud], or 1348 [securities fraud], any rule or regulation of the

activity under SOX, but assumed without deciding that the remaining four activities did constitute protected activity.

9

Securities and Exchange Commission, or any provision of Federal law relating to fraud against shareholders, when the information or assistance is provided to or the investigation is conducted by (A) a Federal regulatory or law enforcement agency; (B) any Member of Congress or any committee of Congress; or (C) a person with supervisory authority over the employee (or such other person working for the employer who has the authority to investigate, discover, or terminate misconduct) . . . .

18 U.S.C. § 1514A(a).

We apply a burden-shifting framework to SOX whistleblower claims incorporated from the Whistleblower Protection Program of the Wendell H. Ford Aviation Investment and Reform Act for the 21st Century ("AIR 21"), 49 U.S.C. § 42121(b). Welch, 536 F.3d at 275. The plaintiff must first establish a prima facie case by proving, by a preponderance of the evidence, that: "(1) she engaged in protected activity;[5] (2) the employer knew that she engaged in the protected activity; (3) she suffered an unfavorable personnel action; and (4) the protected activity was

_____

[5] In Welch, we held that in order to establish that he engaged in protected activity, "an employee must show that his communications to his employer 'definitively and specifically relate[d]' to one of the laws listed in § 1514A." 536 F.3d at 275 (internal citations omitted). The Department of Labor has since concluded that this standard is applied too strictly, and that "the critical focus is on whether the employee reported conduct that he or she reasonably believes constituted a violation of federal law." Sylvester v. Parexel Int'l LLC, ARB Case No. 07-123, 2011 WL 2165854, at * 15 (Dep't of Labor May 25, 2011) (emphasis in original). In light of our holding that Feldman did not satisfy the fourth prima facie prong, we need not clarify here where Welch stands since Sylvester was decided.

a contributing factor in the unfavorable action."[6]  Allen v. Admin. Review Bd., 514 F.3d 468, 475-76 (5th Cir. 2008) (internal citations omitted).  See 29 C.F.R. § 1980.109(a); 49 U.S.C. § 42121(b)(2)(B)(iii).  If the employee meets this burden, the defendant must then "rebut the employee's prima facie case by demonstrating by clear and convincing evidence that the employer would have taken the same personnel action in the absence of the protected activity."  Welch, 536 F.3d at 275 (citing § 42121(b)(2)(B)).  Feldman's appeal centers on the fourth prima facie prong and his claim that the burden shifted to Appellees to prove that they would have terminated him

[6] Notably, we relied in Welch on a four-part standard which frames the fourth element as requiring a prima facie showing that "[t]he circumstances were sufficient to raise the inference that the protected activity was a contributing factor in the adverse decision."  See Welch, 536 F.3d at 275.  However, the regulation cited in Welch relates to a complainant's burden to allege a legally sufficient whistleblower retaliation claim at the investigatory stage.  See 29 C.F.R. § 1980.104.  "As other circuits and the [Administrative Review Board ("ARB")] have noted, however, at the evidentiary stage, the fourth element requires the complainant to prove by a preponderance of the evidence that the 'protected activity was a contributing factor in the adverse action,' 29 C.F.R. § 1980.109(a), and not merely show that '[t]he circumstances were sufficient to raise the inference that the protected activity was a contributing factor in the adverse action,' 29 C.F.R. § 1980.104(e)(2)."  Bechtel v. Admin. Review Bd., U.S. Dep't of Labor, 710 F.3d 443, 448 n.5 (2d Cir. 2013) (emphasis in original) (internal citations omitted).  In this case, wherein we consider Feldman's claims on summary judgment, we therefore apply the contributing factor element as articulated in § 1980.109(a).  See Livingston v. Wyeth, Inc., 520 F.3d 344, 351 (4th Cir. 2008) (citing 49 U.S.C. § 42121(b)(2)(B)).

11

regardless. Before turning to the merits, however, we must first address whether the district court properly exercised jurisdiction over this claim.

## III.

In order to obtain relief under SOX, a plaintiff must file a complaint with the Secretary of Labor through his designee, the Occupational Safety and Health Administration ("OSHA"). See § 1514A(b)(1)(A); 29 C.F.R. § 1980.103. If the Secretary has not issued a final decision within 180 days of the filing of the complaint, and there is no showing that the delay is due to any bad faith by the plaintiff, the plaintiff may file suit in federal district court, "which shall have jurisdiction over such an action without regard to the amount in controversy." § 1514A(b)(1)(B). "The Supreme Court has indicated that a statute requiring plaintiffs to exhaust administrative remedies before coming into federal court may be either jurisdictional in nature or non jurisdictional, depending on the intent of Congress as evinced by the language used." Ace Prop. & Cas. Ins. Co. v. Fed. Crop Ins. Corp., 440 F.3d 992, 996 (8th Cir. 2006) (citing Weinberger v. Salfi, 422 U.S. 749 (1975)). For the purposes of this appeal, we assume, without deciding, that the requirement to exhaust one's administrative remedies as

12

provided for in § 1514A is jurisdictional.[7] See Stone v. Instrumentation Lab. Co., 591 F.3d 239, 240 (4th Cir. 2009) ("[T]he Sarbanes-Oxley Act expressly provides a United States District Court jurisdiction to entertain a whistleblower action."); Stone v. Duke Energy Corp., 432 F.3d 320, 322-23 (4th Cir. 2005) ("Section 1514A(b)(1)(B) confers jurisdiction on a district court when a qualifying complainant files his complaint there.")

"[I]t is the 'special obligation' of appellate courts to evaluate not only their own subject matter jurisdiction 'but also [the jurisdiction] of the lower courts in a cause under review, even though the parties are prepared to concede it.'"

---

[7] Although it does not appear that any federal circuit court has yet reached this issue, several district courts have held that a plaintiff's failure to exhaust his remedies under § 1514A deprives the district court of jurisdiction. See, e.g., Nieman v. Nationwide Mut. Ins. Co., 706 F. Supp. 2d 897, 907 (C.D. Ill. 2010); JDS Uniphase Corp. v. Jennings, 473 F. Supp. 2d 705, 710 (E.D.Va. 2007); Murray v. TXU Corp., 279 F. Supp. 2d 799, 802 (N.D. Tex. 2003). Moreover, the Department of Labor suggested as much when it denied a complainant's motion to withdraw his claim from the agency proceedings and file a de novo lawsuit in federal district court, stating that "[v]oluntary withdrawal would be inconsistent with the general principle of exhaustion of administrative remedies and could arguably run contrary to Complainant's expressed intent by depriving the district court of jurisdiction." Nixon v. Stewart & Stevenson Services, Inc., 2005-SOX-1, 2005 WL 4889007, at *5 (Dep't of Labor Feb. 16, 2005). We need not and do not answer this question here, however, because we hold for the reasons explained below that the district court properly exercised jurisdiction over Feldman's SOX claims, even assuming that a failure to exhaust does impose a jurisdictional bar.

13

Interstate Petroleum Corp. v. Morgan, 249 F.3d 215, 219 (4th Cir. 2001) (internal citations omitted) (second alteration in original).  "[W]e must consider questions regarding jurisdiction whenever they are raised, and even sua sponte."  Id. (citing Plyler v. Moore, 129 F.3d 728, 731 n.6 (4th Cir. 1997)).  Feldman's initial complaint was filed before the required 180-day waiting period expired, but his amended complaint was filed more than 180 days after he filed his OSHA complaint.  Although neither party raised the issue, we therefore requested supplemental briefing to address the following question:

> Does Feldman's amended complaint, wherein he asserts his claim under the Sarbanes-Oxley Act of 2002, relate back to the date of the original complaint under Fed. R. Civ. P. 15(c), and if so, did the district court properly exercise jurisdiction over this claim?

Under Rule 15(c), an amended pleading relates back to the date of the original pleading when "the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out — or attempted to be set out — in the original pleading."  Fed. R. Civ. P. 15(c)(1)(B).  Thus, when a pleading relates back under Rule 15(c), the amended pleading is considered to have been filed on the date that the original pleading which it replaces was filed.

In this case, Feldman filed his OSHA complaint alleging that LEA had violated the whistleblower protections of SOX on November 17, 2009.  He therefore could only obtain de novo

14

review of this claim in federal court if, in the absence of any bad faith on his part, the Secretary had not issued a final decision within 180 days, that is, by May 16, 2010. Although Feldman filed his initial lawsuit more than four months prior to this date, there is no dispute that the Secretary never issued a final decision. In a motion filed on March 23, 2010, Feldman indicated that he intended to amend his complaint to add the SOX claim once it became ripe, and Appellees expressly agreed to the inclusion of this claim in the plaintiffs' amended complaint.

Upon reviewing both complaints, it is evident that, under Rule 15(c), the SOX claim raised in the amended complaint arises out of the conduct, transactions, and occurrences set out in the first complaint. Feldman's initial complaint details his reports about SAFE Source and also his claim that he and Perry told Paul Briggs, LEA's Chief Financial Officer at the time, that they intended to report their suspicions of insider trading to the government. The complaint then alleges that Rand, Lindsay, Jordan, and Carrington thereafter "undertook a campaign to discredit, undermine, intimidate, and retaliate against Feldman for his report to the federal government and for his ongoing cooperation with the resulting federal investigations." Appellant's Supplemental Br. 34-36; see id. 55-56. It further alleges that this retaliatory campaign included the production

15

of falsified Board meeting minutes and leaks of information to Carrington.

By comparison, Feldman's second complaint alleges that he engaged in protected activity under SOX by, among other things, reporting his concerns about SAFE Source to the Board and the government, asking Board members to affirm that they did not leak information to Carrington, objecting to the falsification of meeting minutes, and reporting suspected insider trading. It cannot be seriously doubted that this SOX claim arises out of the same conduct, transactions, and occurrences as the first complaint. Thus, under Rule 15(c), the second complaint does relate back to the date of the first complaint, at which point the court did not have jurisdiction over Feldman's SOX claim.

However, we have previously held that "the filing of a supplemental pleading is an appropriate mechanism for curing numerous possible defects in a complaint." Franks v. Ross, 313 F.3d 184, 198 (4th Cir. 2002) (internal citations omitted). Feldman concedes that he should have presented his SOX claim in a supplemental pleading under Rule 15(d), pursuant to which the court may "permit a party to serve a supplemental pleading setting out any transaction, occurrence, or event that happened after the date of the pleading to be supplemented." Fed. R. Civ. P. 15(d). Considering a similar circumstance, the Eighth Circuit has held that "[e]ven when the District Court lacks

16

jurisdiction over a claim at the time of its original filing, a supplemental complaint may cure the defect by alleging the subsequent fact which eliminates the jurisdictional bar." Wilson v. Westinghouse Elec. Corp, 838 F.3d 286, 290 (8th Cir. 1988) (internal citations omitted).

In Wilson, a plaintiff alleging that his employer refused to rehire him in violation of the Age Discrimination in Employment Act filed suit without waiting the required 60 days after filing his claim with the Equal Employment Opportunity Commission. Id. at 289. He sought to cure this jurisdictional defect by filing a supplemental complaint under Rule 15(d) reasserting the claim after the 60 days passed, but the district court dismissed the claim on the ground that the pleading related back to the date of the first complaint under Rule 15(c). Id. The Eighth Circuit rejected this "hypertechnical interpretation of Rule 15(c)," id. at 290, as it resulted in a "procedural mousetrap" in which the premature assertion of the claim became an "irretrievable mistake that bars jurisdiction for the duration of th[e] lawsuit," id. at 289. The court thus held that "[w]hile the District Court was clearly unable to exercise jurisdiction over Wilson's rehire claim upon the filing of his original complaint, the expiration of the 60-day waiting period was exactly the kind of event occurring after firing that

17

Wilson should have been allowed to set forth in a supplementary pleading under Fed. R. Civ. P. 15(d)." Id. at 290.

Likewise, although Feldman presented his SOX claim in the form of an amended pleading, he clearly sought and was allowed by the court — with Appellees' consent — to add this claim due to the fact that the 180-day waiting period had since expired. Because "we are not required to apply the doctrine of relation back so literally as to carry [a claim] to a time within the [requisite waiting period] so as to prevent the maintenance of the action in the first place," Security Ins. Co. of New Haven, Connecticut v. United States ex rel. Haydis, 338 F.2d 444, 449 (9th Cir. 1964), we construe the present complaint as a supplemental pleading under Rule 15(d), thereby curing the defect which otherwise would have deprived the district court of jurisdiction under Rule 15(c). See United States v. C.J. Elec. Contractors, Inc., 535 F.2d 1326, 1329 (1st Cir. 1976) (citing Security Ins. Co.). See also Mathews v. Diaz, 426 U.S. 67, 75 (1976) (treating a plaintiff's pleadings as properly supplemented under Rule 15(d) in light of the defendant's stipulation that the jurisdictional prerequisites were satisfied while the case was pending in the district court); Fed. R. Civ. P. 8(e) ("Pleadings must be construed so as to do justice.")

18

Finding that the district court had jurisdiction over Feldman's SOX claim, we now turn to the merits of his appeal.[8]

IV.

We review a court's order granting summary judgment de novo. Hill v. Lockheed Martin Logistics Mgmt., Inc., 354 F.3d 277, 283 (4th Cir. 2004). Summary judgment should be granted only when "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Further, summary judgment must be entered against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

"A contributing factor is 'any factor, which alone or in combination with other factors, tends to affect in any way the outcome of the decision.'" Allen, 514 F.3d at 476 n.3 (citing Klopfenstein v. PCC Flow Techs. Holdings, Inc., ARB Case No. 04-

---

[8] In response to our inquiry, Appellees argue alternatively that if the second complaint does not relate back to the first complaint, then the SOX claim is barred by a two-year statute of limitations borrowed from 28 U.S.C. § 1658(b). Even if Appellees are correct that we should impute a limitations period from § 1658(b), a question that we do not decide here, this reasoning would force the Court into a "legal merry-go-round." Security Ins. Co., 338 F.2d at 446. As did the Ninth Circuit, see id., we reject this circuitous approach.

149, 2006 WL 3246904, at * 13 (Dep't of Labor May 31, 2006)). "This element is broad and forgiving," Lockheed Martin Corp. v. Dep't of Labor, 717 F.3d 1121, 1136 (10th Cir. 2013), and "[t]his test is specifically intended to overrule existing case law, which requires a whistleblower to prove that his protected conduct was a 'significant', 'motivating', 'substantial', or 'predominant' factor in a personnel action in order to overturn that action," Marano v. Dep't of Justice, 2 F.3d 1137, 1140 (Fed. Cir. 1993) (construing the contributing factor standard in a Whistleblower Protection Act case and citing explanatory statements from the congressional record). "Temporal proximity between the protected activity and the adverse action is a significant factor in considering a circumstantial showing of causation," Tice v. Bristol-Meyers Squibb Co., 2006-SOX-20, 2006 WL 3246825, at *20 (Dep't of Labor Apr. 26, 2006) (internal citations omitted), and "[t]he causal connection may be severed by the passage of a significant amount of time, or by some legitimate intervening event," Halloum v. Intel Corp., ALJ No. 2003-SOX-7, 2004 DOLSOX LEXIS 73, at *13 (Dep't of Labor Mar. 4, 2004).

In this case, Feldman argues that the court imposed an improperly onerous burden on him to prove that his protected activities solely or substantially caused his termination. We agree that Feldman need not show that the activities were a

20

primary or even a significant cause of his termination. However, he has nonetheless failed to satisfy his rather light burden of showing by a preponderance of evidence that the activities tended to affect his termination in at least some way. Firstly, Feldman concedes the complete absence of temporal proximity here, and his most significant protected activity, his reports regarding SAFE Source, occurred roughly twenty months before his termination. Such a lengthy gap in time weighs against a finding that it is more likely than not that the alleged protected activities played a role in his termination. See Fraser v. Fiduciary Trust Co. Int'l, No. 04 Civ. 6958 (PAC), 2009 WL 2601389, at *6 (S.D.N.Y. Aug. 25, 2009) (ten month gap defeated the contributing factor element).

Secondly, and most significantly, Feldman admits that the Outside Directors considered him to have thrown them under the bus during his meetings with the Wortleys. Tellingly, Feldman's termination came less than one month after his July 27, 2009 meeting with Joseph Wortley and his son, in which he told them that the Outside Directors were loyal to Carrington and "were basically worthless." J.A. 1057-35. He then wrote the Outside Directors telling them it would be in LEA's best interest if they resigned, and stating that Wortley would sue them if they did not do so. Feldman's conduct in the meetings with the Wortleys, whom he was supposed to convince not to sue LEA, and

21

his subsequent letter to the Outside Directors undoubtedly constitute a legitimate intervening event further undermining a finding that his long-past protected activities played any role in the termination. Accordingly, this legitimate intervening event, coupled with the passage of a significant amount of time after Feldman's alleged protected activities, severs the causal connection. See Halloum, 2004 DOLSOX LEXIS 73, at *13.

Feldman nonetheless urges us to find that the asserted protected activities played some role in his termination from his proffered evidence of recurring retaliatory animus. For instance, he claims that the leak of information to Carrington after his reports regarding SAFE Source is proof of retaliatory animus. Certainly, Feldman's reporting about SAFE Source was the activity that was most likely to prompt retaliation against him, as it resulted in a federal investigation. Still, most damaging to his claim, Feldman does not dispute that Perry also reported the impropriety but was asked to remain at LEA. Given the fact that Perry was urged to stay despite participating in the very same conduct, Feldman has not shown that it is more likely the case than not that this particular activity played a role in his termination. With respect to the remaining activities, there was indeed animus between Feldman and the Outside Directors after Feldman's conduct, but he has not shown that the animus was a retaliatory response to his activities.

22

Instead, he acknowledges that the acrimony began nearly two months before his first activity, and has offered no evidence that his conduct changed the bitter status quo in any way.

Feldman further attempts to show recurring retaliatory animus by asserting that the Outside Directors deviated from LEA's policies after his protected activities by requiring him to obtain prior approval before entering a new lease, falsifying Board meeting minutes, and asserting that he had produced insufficient financial information. Firstly, Feldman himself argued on appeal that the Outside Directors expressed concerns about entering a new lease in November 2007, before any alleged protected activity occurred, and that they opposed the move only because they thought it would upset Carrington. Thus, by Feldman's own assertions, the change in policy regarding his ability to enter a new lease was based on a desire to appease Carrington, rather than a desire to retaliate against him for conduct that had yet to occur. Feldman's claim that LEA changed its policies by falsifying its minutes is also unavailing because Littman and Finkelstein had produced competing versions of the meeting minutes starting from the November 1, 2007 Board meeting, again before any alleged protected activity.

With respect to the Board's dissatisfaction with the financial information that Feldman provided, he has offered no evidence to refute Littman's testimony that there was no per se

23

policy on what had to be provided, but rather a practice where the Board could contact himself, Littman, or Briggs when they wanted further information. Thus, even if the Outside Directors became unhappy with the information Feldman provided after his alleged protected activity, their indication that they wanted more information is consistent with the only record evidence as to the Board's practices for accessing financial information.

Lastly, Feldman argues that his strong work performance and the company's successes during his tenure are further proof that his termination was in retaliation for protected conduct. Assuming that LEA was successful during this time because of Feldman's efforts, he has offered no evidence that LEA considered him to have a strong performance record. See Smith v. Flax, 618 F.2d 1062, 1067 (4th Cir. 1980) (age discrimination case explaining that an employee's perception of himself is irrelevant, and "[i]t is the perception of the decision maker which is relevant.") Further, LEA did not cite substandard performance as the reason for Feldman's termination, but rather, insubordination. Feldman disputes that he was insubordinate, but we do not decide whether LEA's reason for terminating him was wise, fair, or correct, nor do we "sit as a kind of super-personnel department weighing the prudence of employment decisions made by firms charged with employment discrimination."

DeJarnette v. Corning Inc., 133 F.3d 293, 299 (4th Cir. 1998) (internal citations omitted).

The contributing factor standard in SOX cases is indeed meant to be quite broad and forgiving. However, under the particular circumstances presented here, the standard would simply be toothless if we held that a preponderance of the evidence shows that these long-past activities affected Feldman's termination given the lengthy history of antagonism and the intervening events which caused the Outside Directors to view Feldman as insubordinate. Feldman has not successfully established the contributing factor element of his prima facie case, and we therefore need not consider whether Appellees can show by clear and convincing evidence that he would have been fired regardless of any protected activities. Accordingly, Appellees are entitled to judgment as a matter of law.

V.

For the aforementioned reasons, the district court is

AFFIRMED.