**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 25-1190**

---

EXCLUSIVE JETS, LLC, d/b/a Fly Exclusive,

      Petitioner,

    v.

UNITED STATES DEPARTMENT OF LABOR, ADMINISTRATIVE REVIEW BOARD,

      Respondent,

    and

MICHAEL J. JONES,

      Intervenor.

---

On Petition for Review of an Order of the United States Department of Labor, Administrative Review Board. (2023-0035)

---

Submitted: March 2, 2026                       Decided: April 30, 2026

---

Before WYNN and QUATTLEBAUM, Circuit Judges, and FLOYD, Senior Circuit Judge.

---

Petition for review granted in part and denied in part; vacated in part and remanded by unpublished opinion. Judge Wynn wrote the opinion, in which Judge Quattlebaum and Senior Judge Floyd joined.

---

**ON BRIEF:** Zebulon D. Anderson, Danielle B. Dobosz, SMITH, ANDERSON, BLOUNT, DORSETT, MITCHELL & JERNIGAN, LLP, Raleigh, North Carolina, for Petitioner.  Jonathan L. Snare, Acting Solicitor of Labor, Jennifer Brand, Associate Solicitor, Sarah K. Marcus, Deputy Associate Solicitor, Jennifer Huggins, Karla Jackson Edwards, Office of the Solicitor, UNITED STATES DEPARTMENT OF LABOR, Washington, D.C., for Respondent.  Morgan W. Campbell, FOX ROTHSCHILD, LLP, Washington, D.C., for Intervenor.

_____

Unpublished opinions are not binding precedent in this circuit.

WYNN, Circuit Judge:

Under the whistleblower protection program established by the Wendell H. Ford Aviation Investment and Reform Act for the 21st Century ("Aviation Reform Act"), 49 U.S.C. § 42121, an employee who proves being discharged by an employer for reporting aviation safety concerns, is entitled to relief, subject to the duty to mitigate damages under the proper legal standard.

In this matter, after Exclusive Jets, LLC fired Michael Jones, a Department of Labor administrative law judge ("ALJ") found that Jones had established that his discharge violated the Aviation Reform Act, and the Administrative Review Board ("ARB") affirmed. Although we hold that the ARB properly affirmed the ALJ's liability determination, we conclude that it evaluated Jones's mitigation efforts under a "gross or egregious conduct" standard instead of the proper "reasonable diligence" standard.

Thus, we grant in part and deny in part the petition for review and remand to the ARB with instructions to apply the correct legal standard to assess Jones's duty to mitigate damages.

## I.

### A.

In reciting the following facts, we remember that this Court reviews the agency's factual findings deferentially, upholding them if they are "supported by substantial evidence." *Northrop Grumman Sys. Corp. v. U.S. Dep't of Lab.*, 927 F.3d 226, 232 (4th Cir. 2019).

On January 3, 2018, Exclusive Jets president Mike Guina sent an email to all its pilots asking them to share their concerns, acknowledging that previous pilot feedback had not led to clear changes and that the pilots had heavy workloads. Jones, who was then working for the company as a First Officer, responded with a lengthy email that raised many concerns. He alleged, among other things, that flight crews and captains did not want to document aircraft defects, which posed a safety issue. Guina forwarded this email to the company's director of operations, Jon Heuman.

Around the same time, Exclusive Jets asked fleet lead pilot Dominic Publico to evaluate Jones. After flying with Jones for about a week, Publico sent an email criticizing Jones's attitude and flying abilities and recommending that Exclusive Jets fire Jones. Exclusive Jets rejected that recommendation.

Instead, in May 2018, Exclusive Jets promoted Jones from First Officer to Captain. Heuman, Guina, and others thought that "a lot of [Jones's] complaints" seemed to stem from his opinion "that he should be captain," and so the promotion might "have a positive change on his behavior." J.A. 3124.[1]

But Jones continued to raise safety issues. In June 2018, Jones reported an issue with a wind screen, which meant that the plane should not be flown in known icing conditions. Guina called Jones, agreeing that "it would be [Jones's] call" but that he would "hate to think that the flight wouldn't go." J.A. 2658, 2661. Jones completed the flight, flying at a lower altitude to avoid icing conditions.

---

[1] Citations to the "J.A." refer to the Joint Appendix filed by the parties in this matter.

4

A few days after this exchange, Guina invited Jones to a meeting to discuss Jones's grievances. Present at the meeting were Jones, Guina, Heuman, chief pilot Scott Petersen, and director of maintenance Darryl Shearer. There, Jones began reciting his list of problems, many of which were issues that he had discussed in his January email. Attendees uniformly called the meeting hostile, unproductive, and relatively short.

From August 2018 to January 2019, several First Officers complained about working with Jones. In December 2018, Publico emailed Jones that no First Officers wanted to work with him because his "attitude in the cockpit ha[d] become toxic." J.A. 2136.

Jones continued to report safety concerns, which sometimes led to aircraft being grounded. Heuman testified that his impression during Jones's employment was that he "had more aircraft write-ups than anybody in the company."[2] J.A. 3187.

Jones began what would turn out to be his final eight-day rotation with Exclusive Jets on February 5, 2019. That day, Jones noticed issues that made his assigned aircraft not airworthy, and it was eventually grounded. Previous crews had not noticed or had not documented these mechanical irregularities. On February 6, he sent an email to Exclusive Jets' maintenance supervisor that listed the irregularities, copying Heuman, Petersen, and Publico. He also entered the irregularities into the aircraft's logbook.[3] A maintenance

---

[2] That impression turns out to have been incorrect, as Exclusive Jets discovered during the ensuing litigation.

[3] An aircraft logbook is the record of an aircraft's operation and maintenance history. *See* 14 C.F.R. § 135.65 (providing that each aircraft must "carr[y] on board" an "aircraft maintenance log . . . for recording or deferring mechanical irregularities and their correction").

supervisor commended Jones and wrote that he couldn't "believe [the plane had] been flying round all this time and nobody else caught it." J.A. 3489.

The plane was apparently repaired and set to return to service on February 7. That day, however, Exclusive Jets manager Josh Golden emailed Heuman and Guina that Jones was "already at the plane" and was writing up so many additional safety concerns about it that Golden believed Jones "clearly" had previously "sav[ed] some things" to report about it. J.A. 1934. Golden further wrote that he and another manager had "agreed that if Jones does not make his flights today then we will send him home, and we will bring [another pilot] out to replace him. I am done." *Id.*

The next day, Jones was assigned to perform a maintenance test flight on another aircraft, but he emailed Heuman, Petersen, and others that he was concerned about conducting the test flight in poor weather conditions. Fourteen minutes later, Guina emailed Petersen stating, "We have to get this under control," J.A. 2958, which he later testified was because he wanted "the flight to happen if" it could, J.A. 2960. While the question of whether to proceed with the test flight was still pending, Jones's wife called to tell him that she had looked at his schedule and seen that he was now "on standby for eternity"—that is, he had been removed from his next (previously assigned) rotation and had no further rotations scheduled. J.A. 2492.

The test flight ultimately had to be rescheduled after Jones's First Officer was injured during the pre-flight inspection. Jones completed the test flight two days later, on February 10, with another pilot. Afterward, the other pilot told Jones to go home, even though Jones still had two days left in his rotation. Jones did not hear anything further from

6

Exclusive Jets for more than two weeks. On February 27, Petersen called to tell Jones that he was being fired for not being "a good fit." J.A. 2501.

Jones then attempted to find another job. On March 25, 2019, Gama Aviation offered him a job as a captain. Jones completed many parts of the onboarding process, but Gama Aviation withdrew its offer after Jones did not timely submit the training agreement. Jones attempted twice to call the recruiter to smooth things over, but to no avail.

Jones continued to look for work as a pilot, but he accepted jobs at Walmart in 2020 and for the City of Rockledge in 2021. In September 2021, JetBlue hired him as a pilot.

B.

In March 2019, Jones filed a complaint with the Occupational Safety and Health Administration ("OSHA"), alleging that he had been fired "in retaliation for grounding aircraft for safety and mechanical issues and for identifying potential violations under AIR21." J.A. 3. OSHA dismissed the complaint after determining that its investigatory evidence did not show that Jones's termination was in retaliation for engaging in protected activity. Jones objected to OSHA's findings and requested a hearing before an ALJ.

After the parties completed discovery, the ALJ conducted evidentiary hearings and received post-hearing briefs. Ultimately, the ALJ concluded that Jones had prevailed and was entitled to damages for back pay, emotional harm, and costs and attorneys' fees.

Exclusive Jets appealed, and the ARB affirmed in relevant part.[4] Exclusive Jets then timely petitioned this Court for review.

---

[4] The ARB agreed with Exclusive Jets on its challenge to the method for calculating interest on the back-pay award, but that issue is not before us.

7

II.

We review the ARB's determinations under the Administrative Procedure Act, and thus we disturb its decision only if that decision "was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Northrop Grumman*, 927 F.3d at 232 (cleaned up). We review questions of law de novo, and we uphold factual findings "if supported by substantial evidence." *Id.* "Similarly, the ARB reviews 'the factual determinations of the ALJ under the substantial evidence standard.'" *Greatwide Dedicated Transp. II, LLC v. U.S. Dep't of Lab.*, 72 F.4th 544, 552 (4th Cir. 2023) (quoting 29 C.F.R. § 1978.110(b)). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Easterbrook v. Kijakazi*, 88 F.4th 502, 511 (4th Cir. 2023) (cleaned up).

III.

An Aviation Reform Act claim requires a complainant to "present a prima facie case demonstrating by a preponderance of the evidence that: (i) they engaged in protected activity, (ii) the employer knew of the protected conduct, (iii) their employer took an unfavorable employment action against them, and (iv) the protected activity was a contributing factor to the employer's adverse employment action."[5] *Greatwide*, 72 F.4th at 553.

---

[5] This burden-shifting framework is shared across several federal whistleblower statutes, including the Sarbanes-Oxley Act, and thus we look generally to the cases applying that framework. *See Feldman v. L. Enf't Assocs. Corp.*, 752 F.3d 339, 344 (4th Cir. 2014) (noting that Sarbanes-Oxley whistleblower claims incorporate the Aviation Reform Act's burden-shifting framework).

Once a complainant has established a prima facie case, "the burden shifts to the employer to demonstrate, by clear and convincing evidence, that the employer would have taken the same unfavorable personnel action in the absence of that protected behavior." *Id.* at 553–54 (cleaned up); *see* 49 U.S.C. § 42121(b)(2)(B). Once liability is established, the agency orders a remedy that includes back pay and other compensatory damages. *See* 49 U.S.C. § 42121(b)(3)(B). However, a complainant's ability to claim back pay is limited by a duty to mitigate damages. *See O'Neal v. Gresham*, 519 F.2d 803, 805 (4th Cir. 1975) (explaining that the duty to mitigate applied to an "improperly discharged employee" in a 42 U.S.C. § 1983 discharge case just as it did "in any other" employment case); *Brady v. Thurston Motor Lines, Inc.*, 753 F.2d 1269, 1273 (4th Cir. 1985).

Exclusive Jets challenges the ARB's conclusion that there was substantial evidence to support the ALJ's determinations (1) that Jones engaged in protected activity, (2) that Jones's protected activity was a contributing factor in his termination, (3) that Exclusive Jets failed to demonstrate by clear and convincing evidence that it would have terminated Jones absent his protected activity, and (4) that Jones mitigated his damages. We disagree on the first three points, but we vacate and remand for further proceedings on the fourth.

## A.

We begin with protected activity. An employee engages in protected activity by providing "information regarding violations 'relating to air carrier safety' to his or her employer or federal authorities." *Lawson v. FMR LLC*, 571 U.S. 429, 434 (2014) (quoting 49 U.S.C. § 42121(a)(1)).

9

Though we have not opined on the matter, we find ARB precedent on the issue helpful. Under those decisions, a "logbook entry in and of itself" does not necessarily constitute protected activity. *Luder v. Cont'l Airlines, Inc.*, ARB No. 10-026, 2012 WL 376755, at *5 (Dep't of Lab. Jan. 31, 2012). Nor does "'[c]ompetently' and 'aggressively' carrying out duties to ensure safety." *Sievers v. Alaska Airlines, Inc.*, ARB No. 05-109, 2008 WL 316012, at *4 (Dep't of Lab. Jan. 30, 2008). However, related activities may be protected. *See, e.g.*, *id.* at *4 (informing an airline manager about an incident and refusing to sign off on a plane's airworthiness); *Douglas v. Skywest Airlines, Inc.*, ARB Nos. 08-070, 08-074, 2009 WL 3165859, at *5 (Dep't of Lab. Sep. 30, 2009) (declaring a crew unfit to fly and informing supervisors); *Hirst v. Se. Airlines, Inc.*, ARB Nos. 04-116, 04-160, 2007 WL 352447, at *4 (Dep't of Lab. Jan. 31, 2007) (raising safety concerns with the airline's flight operations director and questioning the legality of flying an airplane with increased weight).

Here, the ALJ determined that Jones's "logbook entries were protected activity." J.A. 3509. The ALJ then went on to consider the causal link between "the February 7, 2019 events" and Jones's "termination less than three weeks later." J.A. 3513. Those events included, for example, Golden's correspondence following Jones's reports to maintenance control that expressed frustration about whether Jones would "make his flights today" because of his continued reporting. J.A. 1934.

Upon review, the ARB concluded that the ALJ had erred to the extent the ALJ applied a *per se* rule that logbook entries are protected activity. But the ARB then concluded that any error was harmless because Jones's "actions on February 5–8, 2019

10

went beyond mere logbook entries and unquestionably constitute protected activity," J.A. 3975, and it was clear from the ALJ's analysis that the ALJ considered more than simple logbook entries.

We find no error—legal or factual—in that conclusion.

Legally, the ARB did not err in forgiving the ALJ's "misstatement," J.A. 3975, that logbook entries constitute *per se* protected activity because the ALJ had made other factual findings that together rose to the level of protected activity. *Sea "B" Mining Co. v. Addison*, 831 F.3d 244, 253 (4th Cir. 2016) ("Administrative adjudications are subject to the same harmless error rule that generally applies to civil cases.").

Factually, the ARB did not err in determining that substantial evidence supported the ALJ's ultimate conclusion that Jones engaged in protected activity. As the ARB noted, the ALJ cited more than just the instances in which Jones had "not[ed] mechanical irregularities in an aircraft's logbook." J.A. 3975. The ALJ's analysis also included factual findings that, between February 5 and 8, Jones notified a manager about a software compatibility issue, called the manufacturer of the flight management system, made ten logbook entries, emailed a list of mechanical issues to maintenance control and Exclusive Jets executives, and emailed executives about weather concerns. Taken as a whole, those factual findings were more than sufficient to support an overall finding that Jones had engaged in protected activity under the Aviation Reform Act.

Thus, the ARB properly affirmed the ALJ's findings and conclusions regarding protected activity.

11

B.

Next, we consider contributing-factor causation. "A contributing factor is 'any factor, which alone or in combination with other factors, tends to affect in any way the outcome of the decision.'" *Feldman v. L. Enf't Assocs. Corp.*, 752 F.3d 339, 348 (4th Cir. 2014) (quoting *Allen v. Admin. Rev. Bd.*, 514 F.3d 468, 476 n.3 (5th Cir. 2008)). The contributing-factor test "is specifically intended" to supplant case law that requires "a whistleblower to prove that his protected conduct was a 'significant,' 'motivating,' 'substantial,' or 'predominant' factor." *Id.* (quoting *Marano v. Dep't of Just.*, 2 F.3d 1137, 1140 (Fed. Cir. 1993)). The Supreme Court has emphasized that the contributing-factor standard "reflects a judgment that personnel actions against employees should quite simply not be based on protected whistleblowing activities—not even a little bit." *Murray v. UBS Sec., LLC*, 601 U.S. 23, 36–37 (2024) (cleaned up).

Here, in concluding that Jones's protected activity was a contributing factor to his termination, the ALJ and ARB relied heavily on Heuman's testimony that "a secondary reason [Jones] was terminated is because he engaged in malicious compliance" by delaying reporting a mechanical issue until a time that was convenient for him. J.A. 3191; *see* J.A. 3187–88 (explaining "malicious compliance" as meaning that a pilot might think, "I want to go out to dinner in Salt Lake City so I'm going to wait until [I'm] there and write [my report] up then"). Exclusive Jets argues that was error because Heuman's admission was only that Exclusive Jets fired Jones in part for *delaying* a report, not necessarily *filing* a report.

But that argument fails for two reasons.

12

First, what Heuman describes as "malicious compliance" has two components: delay and compliance. Indeed, Heuman agreed that if Jones's reports were not held back, "it's not malicious compliance, it's just compliance." J.A. 3194. Thus, the ALJ's finding that there was "no credible evidence" that Jones's reports were "maliciously held for a later time" supports the ALJ's conclusion that Exclusive Jets was motivated by the act of compliance itself, rather than any purported delay. J.A. 3508.

Second, as the ARB found, other evidence in the record corroborated the ALJ's finding that Heuman was actually admitting to firing Jones for protected activity. As Jones sat on a plane drafting reports, an Exclusive Jets employee wrote an email stating that Exclusive Jets employees had "agreed that if Jones does not make his flights today then we will send him home." J.A. 1934. Other evidence showed that Exclusive Jets had repeatedly labeled Jones "a high producer" of safety reports, lending support to the idea that what concerned Exclusive Jets about Jones was his *filing* of the reports, not merely their delay. J.A. 3509. And Heuman separately testified that whereas other pilots had been counseled about malicious compliance, Jones had not, undermining the suggestion that Exclusive Jets was concerned about Jones's engaging in this behavior.

At bottom, Exclusive Jets asks us to reweigh the evidence and interpret Heuman's testimony differently than the ALJ did. The ARB properly declined to do so, and we would err if we did otherwise. *See Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)) ("In reviewing for substantial evidence, we do not undertake to reweigh conflicting evidence, make credibility

13

determinations, or substitute our judgment for that of the [ALJ].”). The ARB properly affirmed the ALJ’s causation determination.[6]

C.

Next, we consider Exclusive Jets’ same-decision defense. Once a complainant establishes a prima facie case, an employer may nevertheless avoid liability if it demonstrates, “by clear and convincing evidence, that [it] would have taken the same unfavorable personnel action in the absence of that protected behavior.” *Greatwide*, 72 F.4th at 553–54 (citation omitted). It is not enough for the employer to prove that it “*could have*” taken the same action; rather, the employer must show that it “*would have*” fired the employee in the absence of his protected activity. *Parker v. BNSF Ry. Co.*, 137 F.4th 957, 964 (9th Cir. 2025); *see also Murray*, 601 U.S. at 38 (quoting *Bostock v. Clayton County*, 590 U.S. 644, 656 (2020)) (“The right way to think about that kind of same-action causation analysis is to ‘change one thing at a time and see if the outcome changes.’”).

The ALJ found that Exclusive Jets had shown “a preponderance of evidence that it *could* have” fired Jones in the absence of his reports, but it had not established “by clear and convincing evidence that it *would* have done so.” J.A. 3515. The ARB affirmed, again under a substantial-evidence standard.

---

[6] Exclusive Jets also argues that, discounting Heuman’s testimony, evidence of temporal proximity alone was insufficient to support a causality finding. Because we conclude that the ARB properly affirmed the ALJ’s finding regarding Heuman’s testimony, we do not reach this argument.

14

Exclusive Jets argues that the ALJ failed to consider all of its evidence and that the ARB impermissibly focused on the merits of the termination rather than the truthfulness of Exclusive Jets' proffered reason for firing Jones. We disagree.

First, the ALJ extensively evaluated Exclusive Jets' evidence. The ALJ reviewed evidence that Jones was "difficult to work with," J.A. 3493, and noted instances in which the ALJ accorded certain evidence little weight or found witnesses more or less credible. Second, the ARB did not require Exclusive Jets to defend the merits of firing Jones for unprotected reasons. It simply noted that Exclusive Jets' inability to explain why it had never disciplined Jones, retrained or otherwise corrected him, or tried reassigning him to another crew rotation, indicated that Exclusive Jets had not shown—by clear and convincing evidence—that it would have fired Jones for those valid reasons.

## D.

Having concluded that the ARB properly affirmed the ALJ's conclusions regarding liability, we turn to damages. Exclusive Jets argues that the agency applied the incorrect legal standard to Jones's duty to mitigate damages. We agree, so we vacate and remand for further proceedings.

Jones's ability to claim back pay is limited by his duty to mitigate damages. *See Brady*, 753 F.2d at 1273. To fulfill this duty, a claimant "must exercise reasonable diligence in finding other suitable employment." *Id.* at 1277 (cleaned up). Then, they "must also use reasonable diligence to maintain any suitable employment which is secured." *Id.* An employer has the burden of proving that a terminated employee "failed to exercise such diligence in seeking employment." *Id.* at 1274.

15

The ARB, however, applied a higher standard, requiring an employer to show that "the employee's misconduct is gross or egregious," or that "it constitutes a willful violation of company rules" for a termination stemming from that conduct to toll back-pay liability. J.A. 3986. The ARB pointed to this Court's statements that "an employee who willfully loses employment by engaging in deliberate or gross misconduct is not entitled to backpay for a resulting earnings loss." *N.L.R.B. v. Pepsi Cola Bottling Co. of Fayetteville*, 258 F.3d 305, 311 (4th Cir. 2001) (cleaned up). But it misunderstands that precedent. Although gross or deliberate misconduct is sufficient to show a failure to mitigate, it is not a necessary showing. Indeed, we have explicitly rejected a "narrow" standard that would deny back pay "only to those whose discharges result from wanton, or wilful, deliberate, or intentional behavior." *Brady*, 753 F.2d at 1277.

In response, the Department of Labor and Jones argue that *Brady* articulated the standard for Title VII but that Aviation Reform Act claims are different. We disagree. Title VII's duty to mitigate, though enshrined in statutory language, is "rooted in an ancient principle" of the law of damages that "requires the claimant to use reasonable diligence in finding other suitable employment." *Ford Motor Co. v. EEOC*, 458 U.S. 219, 231 (1982). That principle applies equally to Title VII and the Aviation Reform Act.

Thus, the ARB erred when it required Exclusive Jets to show that Jones engaged in gross or egregious misconduct before it would hold Jones to a duty to mitigate his damages.

Even so, "[a]dministrative adjudications are subject to the same harmless error rule that generally applies to civil cases." *Sea "B" Mining*, 831 F.3d at 253. For example, we have held that the erroneous application of a clear and convincing standard, rather than a

16

preponderance of the evidence standard, was harmless because the agency concluded that there was "no evidence" to meet either burden. *Downey v. U.S. Dep't of the Army*, 685 F. App'x 184, 191 n.6 (4th Cir. 2017) (emphasis omitted).

We cannot find harmlessness here, however, because the ARB only concluded that substantial evidence supported the ALJ's determination that Jones "did not engage in gross or egregious misconduct, nor a willful violation of company rules." J.A. 3987. It did not separately analyze whether Exclusive Jets had met its burden to demonstrate that Jones failed to exercise reasonable diligence in seeking employment after his termination. The agency may well reach the same conclusion under the proper standard, but we will vacate and remand for it to decide the matter in the first instance.

IV.

In sum, we conclude that the ARB properly affirmed the ALJ's findings and conclusions as to liability, and thus we deny that portion of Exclusive Jets' petition for review. But because we conclude that the ARB applied the incorrect legal standard when considering Jones's duty to mitigate damages, we grant that portion of the petition for review, vacate the portion of the ARB's opinion concerning tolling Exclusive Jets' back-pay obligations, and remand for the agency to apply the correct standard.

*PETITION GRANTED IN PART AND DENIED IN PART;*
*VACATED IN PART AND REMANDED*