PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No.  15-2034
_____

JEFFREY A. WIEST;
LAURA E. WIEST, His Wife,

                                    Appellants

v.

TYCO ELECTRONICS CORPORATION
_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civ. No. 2-10-cv-03288)
Honorable Gene E.K. Pratter, District Judge
_____

Submitted under Third Circuit L.A.R. 34.1(a)
December 11, 2015

BEFORE:  FUENTES, CHAGARES, and GREENBERG,
Circuit Judges

(Filed: February 2, 2016)
_____

Richard C. Angino, Esq.
Angino & Lutz
4503 North Front Street
Harrisburg, PA 17110

   Attorneys for Appellants

Peter O. Hughes, Esq.
Brian D. Lee, Esq.
Ryan T. Warden, Esq.
Ogletree, Deakins, Nash, Smoak and Stewart
10 Madison Avenue, Suite 400
Morristown, N.J. 07960

   Attorneys for Appellee

_____

OPINION OF THE COURT
_____

GREENBERG, Circuit Judge.


I.  INTRODUCTION

Plaintiff, Jeffrey Wiest, appeals from the District Court's order granting summary judgment to defendant, Tyco Electronics Corporation ("Tyco"), in his action alleging that Tyco violated the anti-retaliation provision of the Sarbanes-Oxley Act, 18 U.S.C. § 1514A. Wiest, formerly a Tyco employee, claims that Tyco unlawfully terminated his employment for reporting suspected securities fraud violations pertaining to the accounting treatment of two Tyco events.

Specifically, Wiest claims that he engaged in a six-month "anguished field battle" during which he frustrated Tyco's management with his refusals as an accountant to process payments allegedly due from Tyco that, insofar as germane to this appeal, related to two Tyco employee and dealer meetings in resort settings.

Tyco, on the other hand, contends that Wiest's involvement with the specific events at issue was minimal and he did not frustrate, or even inconvenience, anyone in Tyco's management by his conduct. Tyco asserts that more than eight months after he engaged in what he contends was protected activity, Tyco's human resources director—who had no involvement with, or knowledge of, Wiest's protected activity—conducted an investigation after she received multiple complaints that Wiest made inappropriate sexual comments to several female Tyco employees, and that he had inappropriate sexual relationships with two subordinates during his employment. Tyco argues that the findings from this investigation caused it to take employment actions with respect to Wiest unrelated to the accounting issues he had raised.

We conclude that Wiest has failed to offer any evidence to establish that his protected activity was a contributing factor to any adverse employment action that Tyco took against him. Specifically, the record is devoid of any evidence that Wiest's conduct frustrated personnel in management or that, even if he frustrated management personnel, any such individual was involved in the investigation and an ultimate recommendation to terminate his employment. Further, even if Wiest could satisfy those threshold requirements, Tyco has demonstrated that it would have taken the same actions with respect to Wiest in the absence of Wiest's accounting activity given the thorough, and

3

thoroughly documented, investigation conducted by its human resources director. Because there are no genuine issues of material fact with respect to Wiest's anti-retaliation claim under the Sarbanes-Oxley Act, we will affirm the District Court's grant of summary judgment.

## II. FACTUAL AND PROCEDURAL BACKGROUND

We review the record in the light most favorable to the party opposing summary judgment—here, the plaintiff. See Reedy v. Evanson, 615 F.3d 197, 210 (3d Cir. 2010). Nevertheless, we do not at the summary judgment stage of proceedings accept as true allegations unsupported in the record. See Williams v. Borough of West Chester, 891 F.2d 458, 460 (3d Cir. 1989) (internal citations omitted) ("[E]ven though the right to a jury trial is implicated, a nonmoving party must adduce more than a mere scintilla of evidence in its favor and cannot simply reassert factually unsupported allegations contained in its pleadings.").

### A. The Protected Activity

Wiest at all relevant times was Tyco's Accounts Payable Manager. In that capacity he oversaw the processing and payment of expense reimbursements for various business units within Tyco. The present action stems from Wiest's involvement with expenses and invoices submitted in connection with two[1] Tyco events, both of which involved its

---

[1] Wiest's initial complaint alleged that he engaged in other protected actions, but we previously determined that all but two of those actions, those relating to the two events that we discuss

4

Wireless Business Unit.

The first event at issue is the M/A-Com Annual Recognition Event in the Bahamas ("the Bahamas Event"), which was a sales incentive program to reward sales associates and independent dealers who achieved or exceeded their sales targets in the preceding year. On May 28, 2008, Accounts Payable received an email in which Tyco's Wireless Business Unit requested immediate payment of an invoice in the amount of $56,000 for expenses related to the Bahamas Event. The following day, Wiest's subordinate, Catherine Smith—an Accounts Payable Supervisor—emailed Kevin Kelleher, the Wireless Business Unit's Director of Accounting, to request the business purpose of the event, a list of attendees, and a verification of the accounting charge. When she did not receive a response, Smith again requested this information on June 2, 2008.

The next day, June 3, 2008, Wiest emailed his supervisor, Doug Hofsass, to request the same information that Smith previously had sought. Hofsass then contacted Tyco's tax department for assistance with these requests. Wiest acknowledges that his sole involvement with the Bahamas Event was his June 3, 2008 email and that Hofsass, his supervisor, handled all communications with the tax department to resolve the above-noted inquiries. He likewise acknowledges that Hofsass agreed that more information was needed and supported Wiest's inquiry requesting that information. Ultimately, Tyco's Chief Financial Officer, Terrence Curtin, concluded that the

in this opinion, were pled insufficiently and could not withstand defendants' motion to dismiss. See Wiest v. Lynch, 710 F.3d 121, 136-37 (3d Cir. 2013).

event should be treated as taxable compensation to the attending employees. As a consequence, Tyco decided to "gross-up" the attending employees' compensation in order to cover the employees' previously unanticipated tax liability. Beyond the June 3 email, there is no evidence in the record that Wiest made any challenges to Tyco's payment for the Bahamas Event or its treatment of the tax implications to Tyco employees who attended the event.

The second event at issue is the Wireless Systems Segment Business Review Meeting at the Wintergreen Resort in Virginia ("the Wintergreen Event"). On October 8, 2008, Smith received a request to make a $100,000 down payment for the Wintergreen Event. She responded to the request by seeking information regarding the meeting's agenda and a list of attendees. In response to Smith's request for additional information, Kelleher added that approval from Tyco Chief Executive Officer, Thomas Lynch, was required. Smith received the requested information but without the CEO approval. Consequently, Kelleher emailed Chuck Dougherty, Tyco's President, to inform him that "Accounts Payable requires express approval from Tom Lynch." (App. 1326). That email copied several people from Accounts Payable, including Smith and Hofsass, but not Wiest. Moreover, the email requested that copies of return emails regarding this event be sent to Smith and Hofsass.

Two days later, on October 10, 2008, Kelleher emailed Dougherty to follow up on his earlier communication. In that correspondence, Kelleher clarified that approval from CFO Curtin with a copy to CEO Lynch would suffice, given that Lynch was on vacation. Dougherty then emailed Curtin to request the necessary approval. Curtin responded to Dougherty,

6

with a copy to Kelleher, approving the payment. Kelleher then forwarded that approval to Smith, Hofsass, and Wiest. Notably, this was Wiest's first involvement in the accounting aspects of the Wintergreen Event. Wiest emailed Curtin, with copies to Smith and Hofsass, to clarify that Curtin was approving the entire cost of the event, a total of $355,000, and his approval was not limited to the $100,000 down payment. In that email, Wiest asked Curtin to copy Lynch with his response. Curtin thereafter replied and confirmed his approval for the entire cost of the event, but he did not copy Lynch. An hour later, Wiest emailed Hofsass and copied Smith to note again the lack of approval from, or notification to, Tyco's CEO, Lynch. Wiest stated that he would "leave it to [Hofsass's] discretion" as to how to involve Lynch and obtain the requisite approval. There is no record that Wiest had any additional concerns about approval for the Wintergreen Event or concerns about any other issue pertaining to the event.

The crux of Wiest's complaint is that Tyco unlawfully terminated him in retaliation for his conduct in the matters that we describe above. He characterizes the back and forth regarding these events as an "anguished field battle" between himself and Tyco management. (See Appellant's br. at 9). Specifically, he alleges that Tyco "discharged him in retaliation for protected disclosures relating to fraudulent accounting practice, attempted shareholder fraud, and lack of compliance with United States Generally Accepted Accounting Principles ('GAAP')." (App. 229). Tyco contends that to the extent that it took adverse employment action against Wiest when it decided to terminate his employment as a result of its human resources director's investigation of his conduct, it did not do so because of Wiest's actions with respect to the Bahamas or Wintergreen Events.

7

B. Wiest's Concurrent Review

On June 13, 2008—ten days after Wiest's protected activity concerning the Bahamas Event—Hofsass distributed an email to several Tyco employees to inform them that June 19, 2008, would be Wiest's 30-year anniversary with Tyco. This email identified Wiest as a "key factor" in a particular Tyco accounting initiative and noted his other "significant contributions" to Tyco over the years. (App. 267). It also encouraged the email recipients to acknowledge Wiest and congratulate him on this anniversary.

On July 30, 2008—nearly two months after Wiest's protected activity concerning the Bahamas Event—Wiest received the maximum possible "Impact Bonus" in the amount of 10% his annual base salary. The Impact Bonus Recommendation identified Wiest's "focus on 'doing the right thing'" as well as his "significant achievements" within the accounting department as the basis for awarding the maximum possible bonus. (App. 1113). On October 23, 2008—two weeks after the last protected activity pertaining to the Wintergreen Event—Wiest received the highest possible ratings in his annual review.

C. Tyco's Investigation of Wiest

We start our discussion of the investigation of Wiest with a telephone call that Hofsass made on August 7, 2009, to Tyco's human resources director, Susan Wallace. In that call, Hofsass informed Wallace that Mark Williams—one of Hofsass's subordinates—had received complaints that Wiest made inappropriate sexual comments to several Tyco employees. On August 11, 2009, Wallace met with Williams and Hofsass to obtain additional information. During this meeting, Williams

8

provided names of several women who were either targets of, or witnesses to, the alleged inappropriate behavior. Wallace then scheduled interviews with individuals potentially involved as well as other individuals who worked closely with Wiest. Hofsass relayed his concerns about the allegations and stated that he had been completely unaware that Wiest had engaged in this conduct.

In making her investigation, Wallace interviewed at least ten employees, including Wiest. Three female employees relayed information concerning multiple unwanted sexual remarks from Wiest.[2] Each of these women reported that she

[2] The District Court listed several of the inappropriate comments of which Wallace was informed during her investigation, all of which are set forth in Wallace's investigation report:

> (1) that [N.Q.'s] flexibility must be great for sex and her husband must enjoy it; (2) in response to [N.Q.] saying, 'I have a proposition for you,' asking if a coworker should leave the room; (3) after approaching [N.Q.] at her desk late in the day in 2005 and engaging her in an unwanted conversation that lasted over an hour (and included a lunch invitation), suggesting that his taste for exotic foods translates to a willingness to try new things in the bedroom, and stating that he was unable to assess whether [N.Q.'s] taste for exotic foods would translate into her bedroom performance; (4) commenting about [B.S.'s] body in a way that made her uncomfortable; (5) discussing nude beaches and the use of tea as an aphrodisiac with [B.S.], knowing that [B.S.] was a

felt uncomfortable and "trapped" when Wiest approached her. Wallace also learned that women in the office had created a system by which they could alert each other of Wiest's whereabouts—a system to which they sometimes referred as a "Jeff Alert." Wiest concedes that the three women who made the initial complaints of unwanted sexual remarks were unaware of his activity with respect to the Bahamas and Wintergreen Events.

---

regular tea drinker; (6) upon learning that [B.S.'s] husband had given her Christmas gifts for her home, asking, 'No Victoria's Secret gift card?'; (7) telling [B.S.] that he missed his wife's pregnancy hormones and the positive impact they had on their sex life, knowing [B.S.] was pregnant; (8) asking to see pictures from [A.M.'s] bachelorette party, and then telling her about a 'fling' he had with a girl 17 years younger than him who was engaged, which he described as 'fun for everyone' and 'her last hurrah'; (9) telling [A.M.] that cruises were a bad idea for honeymoons because the couple may be too far away from the boat if they had 'urges,' knowing [A.M.] was getting married; and (10) after receiving a sign that read 'The Big One' in honor of his 50th birthday, telling [D.W.] he was going to take the sign home and put it on his bedroom door.

Wiest v. Tyco Elecs. Corp., No. 10-3288, 2015 U.S. Dist. LEXIS 47935, at *8-9 (E.D. Pa. Apr. 13, 2015).

10

Three other employees reported that they witnessed Wiest make sexual remarks, witnessed Wiest brag about previous sexual relationships with women in the office, and/or heard about the sexual remarks and sexual relationships from others in the office. Finally, three employees initially reported that they had no knowledge of any inappropriate behavior by Wiest, but two of these three employees sought follow-up conversations with Wallace to clarify that they were aware that Wiest had had relationships with women in the office. While several of these interviews identified inappropriate conduct from earlier years, the investigation also uncovered contemporaneous documentation to support many of those allegations.

On September 17, 2009, Wallace interviewed Wiest in the presence of another human resources employee who documented the interview. At that time, Wiest denied having prior sexual relationships with any Tyco employee and denied making any of the sexual comments reported to Wallace. Wiest admitted that he had several dates with a subordinate more than nine years before, but stated that the relationship never progressed to a point that would have required him to report the relationship to anyone at Tyco.

The following day, September 18, 2009, Wiest called Wallace to clarify some of the statements he made during his interview. Wallace scheduled a meeting for later that day, during which Wiest stated that any comments he may have made were an attempt at humor, and while perhaps they were misplaced, he did not think any of them crossed any lines. Wiest also requested the opportunity to apologize to anyone he may have offended, but he acknowledged that some people may not have wanted to have contact with him.

On September 30, 2009, Wallace met with several Tyco employees, including Hofsass, Charles Post, an attorney in Tyco's legal department, and Robert Ott, Tyco's Corporate Controller and Hofsass's superior. At that meeting, she indicated that she had made a preliminary decision to terminate Wiest pending a final meeting to allow him another opportunity to respond to her findings from the investigation. Wallace scheduled this final meeting for the following day, October 1, 2009. But before this final meeting could occur, Wiest went out on short-term disability and he never returned to work at Tyco. On March 31, 2010, Tyco administratively terminated his employment because his short-term disability benefits had expired and he still was unable to return to work.

D. Procedural History

Wiest filed an administrative complaint with the U.S. Department of Labor on November 24, 2009, in which he asserted that Tyco had retaliated against him for his protected activity in his accounting capacity. In accordance with 18 U.S.C. § 1514A(b)(1)(B), he filed this action in the District Court on July 7, 2010, after he did not receive a final decision from the Department of Labor within 180 days of the filing of the administrative complaint. Wiest filed the initial District Court complaint on behalf of himself and his wife, Laura Wiest, against Tyco, Thomas Lynch, Terrence Curtin, Charles Post, and Charles Dougherty. The complaint contained four causes of action: Count I: violation of the anti-retaliation provision of the Sarbanes-Oxley Act, 18 U.S.C. § 1514A; Count II: intentional infliction of emotional distress; Count III: wrongful termination; and Count IV: loss of consortium.

On July 21, 2010, the District Court granted the

12

defendants' motion to dismiss Count I for failure to state a claim on the ground that Wiest had failed to plead sufficient facts to support a finding that he engaged in protected activity. See Wiest v. Lynch, No. 10-3288, 2011 U.S. Dist. LEXIS 79283 (E.D. Pa. July 21, 2011). In support of this decision, the Court relied, at least in part, on a superseded agency decision of the Administrative Review Board ("ARB"), which had established that "[f]or a communication to be protected, it must 'definitively and specifically' relate to one of the statutes or rules listed in" 18 U.S.C. § 1514A which precludes retaliation against an employee for taking steps against certain unlawful company activities of which he is aware. Id. at *12-13 (citing Platone v. FLYi, Inc., ARB No. 04-154, 2006 DOLSOX LEXIS 105 (Dep't of Labor Sept. 29, 2006)). The Court dismissed the remaining three counts of the complaint as its only basis for jurisdiction over them was supplemental to its jurisdiction over Count I which it was dismissing. Id. at *30. Wiest moved for reconsideration but on November 16, 2011, the Court denied that motion. See Wiest v. Lynch, No. 10-3288, 2011 U.S. Dist. LEXIS 132114 (E.D. Pa. Nov. 16, 2011).

On March 19, 2013, we partially reversed the District Court's order of dismissal and remanded the case for further proceedings. See Wiest v. Lynch, 710 F.3d 121, 134, 138 (3d Cir. 2013). Specifically, in a divided decision we held that the District Court erred in relying on the "definitively and specifically" standard from Platone which required that for a communication to be protected it must definitively and specifically relate to a statute or rule listed in the anti-retaliation section of the Sarbanes-Oxley Act, 18 U.S.C. § 1514A. We pointed out that the ARB had supplanted the Platone standard in Sylvester v. Parexel Int'l LLC, ARB No. 07-123, 2011 DOLSOX LEXIS 39 (Dep't of Labor May 25, 2011). We

13

concluded that the Sylvester standard—which protects a communication when "the employee has both a subjective and an objective belief that the conduct that is the subject of the communication relates to an existing or prospective violation of one of the federal laws referenced" in 18 U.S.C. § 1514A—was entitled to Chevron deference. Wiest, 710 F.3d at 130-31 (citing Chevron, U.S.A., Inc. v. Natural Res. Def. Council, 467 U.S. 837, 842-43, 104 S.Ct. 2778, 2781-82 (1984)). The majority then applied the Sylvester standard to Wiest's complaint and concluded that with respect to the Bahamas and Wintergreen Events, he adequately had pled facts that, if true, could constitute protected activity under 18 U.S.C. § 1514A. Id. at 134-38. Consequently, we remanded the case with respect to those two communications.[3]

Following remand, the defendants filed a second motion to dismiss for failure to state a claim, which the District Court granted in part and denied in part. See Wiest v. Lynch, 15 F. Supp. 3d 543 (E.D. Pa. 2014).[4] The Court rejected the

---

[3] Judge Jordan dissented on the ground that the Sylvester standard is "impossibly vague" and therefore should not receive Chevron deference. Wiest, 710 F.3d at 142 (Jordan, J., dissenting). Moreover, Judge Jordan concluded that, even applying the objective reasonableness standard of Sylvester, Wiest failed to state a claim because the communications alleged did not amount to allegations of fraud, as is required for a claim under 18 U.S.C. § 1514A. Id. at 144 (Jordan, J., dissenting).

[4] The lapse of time between the remand and any further proceedings was attributable to the District Court's determination to place the case in suspense pending the Supreme

14

defendants' assertions that Wiest had not sufficiently pled either an adverse employment action or a sufficient causal connection between the protected activity and any adverse employment action. See id. at 558-67. The Court granted the motion, however, with respect to three of the four individually named defendants—Lynch, Curtin, and Post—but concluded that Wiest had "just barely state[d] a claim" with respect to the fourth individual, Dougherty. Id. at 566-67.

In November 2014, Wiest filed an amended complaint, in which he no longer named Dougherty as a defendant, and, on the same date, he stipulated to the dismissal of all claims against Dougherty with prejudice. After the parties filed briefs on Tyco's motion for summary judgment, Wiest withdrew his claims for intentional infliction of emotional distress and wrongful discharge as a separate cause of action but not as a part of his anti-retaliation claim, and his wife withdrew her claim for loss of consortium. Wiest v. Tyco Elecs. Corp., No. 10-3288, 2015 U.S. Dist. LEXIS 47935, at *1 (E.D. Pa. Apr. 13, 2015). Consequently, the sole issue before the District Court on the motion for summary judgment was whether there was a genuine issue of material fact with respect to Wiest's anti-retaliation claim against Tyco pursuant to 18 U.S.C. § 1514A. See id. The Court granted Tyco's motion on April 13, 2015, reasoning that there was insufficient evidence for a jury to find that Wiest's

---

Court's decision in Lawson v. FMR LLC, 134 S.Ct. 1158 (2014). The District Court believed that Lawson could clarify a disputed issue regarding the retroactivity of § 929A of the Dodd-Frank Act, which extended the Sarbanes-Oxley Act to wholly-owned subsidiaries of publicly traded corporations. See Wiest, 15 F. Supp. 3d at 550-51. We are not concerned with this issue on this appeal.

protected activity was a contributing factor in Tyco's preliminary or final decision to terminate Wiest's employment. Id. at *36-37. Wiest appealed the grant of summary judgment to Tyco.[5]

### III.  JURISDICTION AND STANDARD OF REVIEW

The District Court had jurisdiction over Wiest's amended complaint pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1367 and we have jurisdiction pursuant to 28 U.S.C. § 1291.  We exercise plenary review over a district court's grant of summary judgment. Blunt v. Lower Merion Sch. Dist., 767 F.3d 247, 265 (3d Cir. 2014), cert. denied, 135 S.Ct. 1738 (2015); Haybarger v. Lawrence Cnty. Adult Prob. & Parole, 667 F.3d 408, 412 (3d Cir. 2012).  Therefore, we consider this matter on a basis identical to that of the District Court.  See Santini v. Fuentes, 795 F.3d 410, 416 (3d Cir. 2015).  Summary judgment is warranted when the movant establishes that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law.  See Fed. R. Civ. P. 56(a); Schaar v. Lehigh Valley Health Servs., Inc., 598 F.3d 156, 157 (3d Cir. 2010). "A fact is 'material' under Rule 56 if its existence or

---

[5] In his brief, Wiest also challenges two discovery-related orders:  (1) the District Court's grant of a protective order to bar the deposition of Tyco CEO Thomas Lynch, and (2) the Court's denial of Wiest's motion to compel two depositions, which he filed three months after completion of the time for discovery. We, however, are satisfied that the Court did not abuse its discretion in making these dispositions and we see no reason to discuss them further.

16

nonexistence might impact the outcome of the suit under the applicable substantive law.  A dispute over a material fact is 'genuine' if 'a reasonable jury could return a verdict for the nonmoving party.'" Santini, 795 F.3d 410, 416 (3d Cir. 2015) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 2510 (1986)).

The moving party bears the initial burden to identify "specific portions of the record that establish the absence of a genuine issue of material fact." Santini, 795 F.3d at 416 (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553 (1986)).  If the moving party satisfies its burden, the burden then "shifts to the nonmoving party to go beyond the pleadings and 'come forward with specific facts showing that there is a genuine issue for trial.'" Id. (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 1356 (1986)); see also Fed. R. Civ. P. 56(e).  While we view the facts in the light most favorable to the nonmoving party, conjecture and speculation will not create a genuine issue of material fact sufficient to withstand the grant of summary judgment. Acumed LLC v. Advanced Surgical Servs., Inc., 561 F.3d 199, 228 (3d Cir. 2009); Lexington Ins. Co. v. W. Pa. Hosp., 423 F.3d 318, 333 (3d Cir. 2005) (citing Hedberg v. Indiana Bell Tel. Co., Inc., 47 F.3d 928, 932 (7th Cir. 1995) ("Speculation does not create a genuine issue of fact; instead it creates a false issue, the demolition of which is a primary goal of summary judgment.")).

## IV.  DISCUSSION

Wiest asserts a claim for unlawful retaliation in violation of 18 U.S.C. § 1514A.  That provision protects whistleblowing

17

employees from retaliation for providing information, either directly or indirectly, about certain types of expressly enumerated illegal activities. See id. § 1514A(a)(1)-(2). The statute provides, in relevant part, that:

> no [publicly-traded] company . . . or any officer, employee, contractor, subcontractor, or agent of such company . . . may discharge, demote, suspend, threaten, harass, or in any other manner discriminate against an employee in the terms and conditions of employment because of any lawful act done by the employee—
>
> (1) to provide information, cause information to be provided, or otherwise assist in an investigation regarding any conduct which the employee reasonably believes constitutes a violation of section 1341 [mail fraud], 1343 [wire fraud], 1344 [bank fraud], or 1348 [securities fraud], any rule or regulation of the Securities and Exchange Commission, or any provision of Federal law relating to fraud against shareholders, when the information or assistance is provided to or the investigation is conducted by –

(A) a Federal regulatory or law enforcement agency;

(B) any Member of Congress or any committee of Congress; or

(C) a person with supervisory authority over the employee (or such other person working for the employer who has the authority to investigate, discover, or terminate misconduct)[.]

Id. § 1514A(a)(1)(A)-(C).

The statute incorporates by reference the rules and procedures applicable to the Wendell H. Ford Aviation Investment and Reform Act for the 21st Century ("AIR-21"). See 18 U.S.C. § 1514A(b)(2)(C) (citing 49 U.S.C. § 42121(b)). Pursuant to that incorporation, the Department of Labor has promulgated a regulation that applies AIR-21's two-part burden-shifting framework to Sarbanes-Oxley complaints. See 29 C.F.R. § 1980.104(e)(2)-(4). Thus, to withstand Tyco's motion for summary judgment, Wiest must identify evidence in the record from which a jury could deduce the following: (1) he "engaged in a protected activity"; (2) Tyco "knew or suspected that [he] engaged in the protected activity"; (3) he "suffered an adverse action"; and (4) "the protected activity was a contributing factor[6] in the adverse action alleged in the

---

[6] Wiest contends that he only need show that "the circumstances were sufficient to raise the inference that the protected activity was a contributing factor in the adverse action." (See Appellant's br. at 44 (citing 29 C.F.R. § 1980.104(e)(2))). That

complaint." Id. §§ 1980.104(e)(2)(i)-(iv), 1980.109(a); accord Araujo v. N.J. Transit Rail Operations, Inc., 708 F.3d 152, 157 (3d Cir. 2013) (quoting Allen v. Admin. Review Bd., 514 F.3d 468, 475-76 (5th Cir. 2008)). If Wiest satisfies his burden to identify evidence to support all four elements, the burden will shift to Tyco to demonstrate "by clear and convincing evidence that [it] would have taken the same [adverse] action in the absence of [any protected activity]." 29 C.F.R. § 1980.109(b); accord Araujo, 708 F.3d at 157 (quoting 49 U.S.C. § 42121(b)(2)(B)(ii)).

Tyco based its motion for summary judgment on its assertion that Wiest had not identified any evidence in the record from which a jury could conclude that Wiest's protected activity was a contributing factor to any adverse action that it may have taken against him. See Wiest, 2015 U.S. Dist. LEXIS 47935, at *18-19. Alternatively, Tyco argued that it would have taken the same action even in the absence of the protected activity. Id. at *19.[7]    Because we find that Wiest has not

standard, however, governs a complainant's ability to proceed with an investigation at the outset. As § 1980.109(a) declares, "[a] determination that a violation has occurred may be made only if the complainant has demonstrated by a preponderance of the evidence that protected activity was a contributing factor in the adverse action alleged in the complaint." Thus, at this stage of the proceedings, Wiest must identify evidence in the record on which a jury could base a finding that the protected activity contributed to Tyco's adverse employment action against him.

[7] Both Tyco and the District Court have assumed for purposes of the summary judgment motion that Wiest could demonstrate that he had engaged in protected activity with respect to the

identified any record evidence to establish causation, we will affirm the District Court's order granting summary judgment to defendant Tyco.

A. Appellant's Procedural Argument

As a threshold matter, Wiest argues that Tyco's summary judgment motion was procedurally barred by previous decisions in this case by application of the doctrine of the law of the case. Specifically, Wiest contends that in light of our and the District Court's previous conclusions that Wiest's complaint sufficiently alleged all four elements of a prima facie case at the motion-to-dismiss stage, he now is entitled to proceed to a jury trial.

This argument fails based on Wiest's critical misapplication of the fundamental distinction between a motion to dismiss under Rule 12(b)(6) and a motion for summary judgment under Rule 56. While at the motion-to-dismiss stage of proceedings a district court is obligated to accept the allegations in a plaintiff's complaint as true, it does not accept mere allegations as true at the summary judgment stage. See Berckeley Inv. Group, Ltd. v. Colkitt, 455 F.3d 195, 201 (3d Cir. 2006). To the contrary, "summary judgment is essentially 'put up or shut up' time for the non-moving party" who "must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." Id. Moreover, "if the non-moving party has the burden of proof at trial, that party must set forth facts sufficient to establish the existence of an element essential to that party's case." Id. (citation and internal quotation marks omitted).

As the District Court aptly noted, when it "ruled on

Bahamas and Wintergreen Events. We do as well.

Tyco's Motion to Dismiss, the analysis centered on whether [Wiest's] allegations, if true, stated a claim for relief. Now, the issue is whether [Wiest has] come forward with sufficient evidence from which a reasonable jury could find that the allegations are, indeed, true." Wiest, 2015 U.S. Dist. LEXIS 47935, at *17. In light of this critical distinction, Wiest's law of the case argument is meritless.

## B. Contributing Factor

In considering the merits of Tyco's motion, we next address whether there is any evidence to support Wiest's claim that his protected activity was a factor that contributed to Tyco taking the adverse action from which he suffered. While we seem not yet to have analyzed this element of an anti-retaliation claim under the Sarbanes-Oxley Act, other courts of appeals have done so and have defined a contributing factor as "any factor, which alone or in combination with other factors, tends to affect in any way the outcome of the decision." Feldman v. Law Enforcement Assocs. Corp., 752 F.3d 339, 348 (4th Cir. 2014); Lockheed Martin Corp. v. Admin. Review Bd., 717 F.3d 1121, 1136 (10th Cir. 2013); Allen, 514 F.3d at 476 n.3. A plaintiff need not provide direct evidence to satisfy this element; rather, circumstantial evidence may be sufficient. See, e.g., Van Asdale v. Int'l Game Tech., 577 F.3d 989, 1003 (9th Cir. 2009). To that end, "'[t]emporal proximity between the protected activity and the adverse action is a significant factor in considering a circumstantial showing of causation.'" Feldman, 752 F.3d at 348 (quoting Tice v. Bristol-Meyers Squibb Co., No. 2006-SOX-20, 2006 DOLSOX LEXIS 44, at *20 (Dep't of Labor Apr. 26, 2006)). Conversely, a "'causal connection may be severed by the passage of a significant amount of time, or by some legitimate intervening event.'" Id. (quoting Halloum v.

22

Intel Corp., No. 2003-SOX-7, 2004 DOLSOX LEXIS 73, at \*13 (Dep't of Labor Mar. 4, 2004)).

With respect to the third element of Wiest's anti-retaliation claim—that he suffered an unfavorable personnel action—we must, at a minimum, define the unfavorable action in order to analyze causation. In this regard, Wiest contends that any one of the following events constituted an adverse employment action on which he can base his anti-retaliation claim: (1) Tyco constructively discharged him in September 2009, (2) Tyco preliminarily terminated him on September 30, 2009, or alternatively (3) Tyco actually terminated him on September 30, 2009. We address each of these theories in turn. Significantly, all three of these events occurred prior to Tyco's administrative termination of Wiest's employment on March 31, 2010, and Wiest does not contend that, standing alone, the March 31, 2010 termination was a retaliatory act.

### 1. Constructive Discharge

Wiest alleges that in late August or early September 2009 "his direct reports and his manager were less communicative and began acting differently to him." (App. 241). Wiest likewise complains about the stress he felt as a result of his interview with Susan Wallace and her investigation. He claims that this stress amounted to a constructive discharge. But Wiest has conceded that Tyco had a duty to investigate when it received the complaints from various employees. In light of this duty to investigate, we will not conclude that enduring the investigation amounted to, or contributed in any way toward a constructive discharge. With respect to Wiest's contention that his colleagues were "less communicative," such conduct is insufficient to constitute a constructive discharge.

When analyzing a constructive discharge claim at the summary judgment stage, we "must determine 'whether a reasonable jury could find that the [employer] permitted conditions so unpleasant or difficult that a reasonable person would have felt compelled to resign.'" Duffy v. Paper Magic Grp., 265 F.3d 163, 167 (3d Cir. 2001) (quoting Connors v. Chrysler Fin. Corp., 160 F.3d 971, 974 (3d Cir. 1998)). Moreover, an employee claiming to have been constructively discharged must demonstrate that the conduct of which he complains "surpasse[d] a threshold of intolerable conditions." Suders v. Easton, 325 F.3d 432, 444 (3d Cir. 2003) (citations and internal quotation marks omitted), vacated on other grounds, Pa. State Police v. Suders, 542 U.S. 129, 124 S.Ct. 2342 (2004). Wiest's contention that he felt isolated from his colleagues is simply insufficient to meet this well-established standard. See Duffy, 265 F.3d at 169-70. Because Wiest has not identified any evidence in the record to support his assertion that he was constructively discharged, we do not undertake a causation analysis with respect to this purported adverse action.

> 2. Preliminary Termination on September 30, 2009

Wiest next argues that Tyco's preliminary decision to terminate his employment constituted an adverse employment action to which his protected activity was a contributing factor. Unlike our conclusion that the evidence was inadequate to support Wiest's constructive discharge claim, we are satisfied that there is ample evidence in the record from which a jury could conclude that Tyco made a preliminary decision to terminate Wiest as of September 30, 2009. We will assume for purposes of this analysis that such a preliminary determination is an adverse employment action, but we then must determine

24

whether a reasonable jury could conclude that his protected activity was a contributing factor in the adverse action. We find that it could not.

First, any inference of causation gleaned from temporal proximity is minimal in light of the ten-month gap between the protected activity and the adverse action. See, e.g., Riddle v. First Tenn. Bank, 497 F. App'x 588, 596 (6th Cir. 2012) (finding four-month gap insufficient to infer causation); Miller v. Stifel, Nicolaus & Co., 812 F. Supp. 2d 975, 988-89 (D. Minn. 2011) (finding eight-month gap insufficient to infer causation). As noted, Wiest last engaged in protected activity on October 10, 2008, and the adverse employment action with respect to the preliminary determination to terminate him occurred in September 2009. Thus, temporal proximity does not support Wiest's theory of causation.

Second, the record overwhelmingly demonstrates "legitimate intervening event[s]," such that any causal connection that could be derived from the circumstances was severed. See Feldman, 752 F.3d at 348. Specifically, the record demonstrates that: (1) Wiest received praise and commendations both during and after his protected activity;[8] (2) none of the

---

[8] Several courts have concluded that an employee's receipt of favorable treatment after engaging in protected activity severely undermines a claim that there was a causal connection between the activity and the adverse employment action. See, e.g., Ameen v. Merck & Co., 226 F. App'x 363, 376 (5th Cir. 2007) (finding that employee's receipt of positive reviews and discretionary bonuses in the year following the alleged protected activity is "utterly inconsistent with an inference of retaliation"); Moticka v. Weck Closure Sys., 183 F. App'x 343, 353 (4th Cir.

25

individuals who initiated the investigation with human resources had any knowledge of Wiest's protected activity; (3) Susan Wallace, who conducted the investigation, had no knowledge of Wiest's protected activity;[9] (4) Wiest's colleagues in the accounting department who were as involved, or more involved, in the same activity did not receive any negative treatment; and (5) Tyco's Wireless Business Unit, the Tyco unit involved in the events, was sold to another company in May 2009 and the employees who Wiest contends he frustrated remained with the unit after the sale and no longer had any involvement with Tyco when the investigation was initiated.

These uncontroverted facts, both individually and collectively, negate any possible inference of causation. Consequently, Wiest cannot withstand the motion for summary judgment on his theory that his protected activity was a

---

2006) (noting that when an employee receives favorable treatment after the alleged protected activity, "the inference of retaliatory motive is undercut").

[9] Wiest asserts that if we reach this conclusion we will be engaging in improper fact-finding at the summary judgment stage. Again, however, Wiest fails to acknowledge his burden at this phase of the litigation. We are not obligated to ignore uncontroverted evidence—here, Wallace's signed affidavit—unless and until Wiest identifies some evidence in the record to create a genuine dispute on this fact. See Pressley v. Johnson, 268 F. App'x 181, 185 (3d Cir. 2008) (citing Arnold Pontiac-GMC, Inc. v. Gen. Motors Corp., 786 F.2d 564, 581 (3d Cir. 1986) ("[I]n reviewing grant of summary judgment, appellate court cannot ignore uncontested facts that render inferences unreasonable.")).

contributing factor in Tyco's preliminary decision to terminate him in late September 2009.

### 3. Final Termination on September 30, 2009

Wiest's final contention with respect to an adverse employment action is that he actually was terminated as of September 30, 2009. This argument fails, first, because the record unequivocally demonstrates that Tyco administratively terminated him on March 31, 2010, after he exhausted his short-term disability leave. Thus, there is no evidence to support even the threshold premise that Tyco actually terminated his employment on September 30, 2009. Moreover, even if Wiest could demonstrate that his employment actually was terminated on September 30, 2009, he cannot demonstrate that there was a causal connection between his protected activities and the adverse employment action for the reasons we have already stated.

### C. Tyco's Affirmative Defense

Even if we assume that Wiest can establish a factual dispute with respect to the issue of whether his protected activity was a contributing factor in some adverse employment action by Tyco with respect to him, Tyco still is entitled to summary judgment as it amply has demonstrated that it would have taken the same action in the absence of any protected behavior. See 29 C.F.R. § 1980.109(b) ("[R]elief may not be ordered if the respondent demonstrates by clear and convincing evidence that it would have taken the same adverse action in the absence of any protected activity."). Wiest's sole challenge to Tyco's affirmative defense is his contention that termination was an unreasonably harsh punishment, and, but for his protected activity, he would have received a more lenient reprimand.

Specifically, he contends that the comments he made "would not be found as offensive to the average employee." (App. 244). But it is not our role to second-guess a human resources decision that followed a thorough investigation. Abels v. DISH Network Serv., LLC, 507 F. App'x 179, 185 (3d Cir. 2012) ("We do not sit as a super-personnel department that reexamines an entity's business decisions."); see also Feldman, 752 F.3d at 350 (extending this logic from Abels to Sarbanes-Oxley claims); Riddle, 497 F. App'x at 596 (same).

The record in this case demonstrates that Tyco initiated an investigation after it received multiple complaints that Wiest engaged in improper conduct. That investigation found ample support for those complaints, and Tyco did not violate the Sarbanes-Oxley Act when it took adverse employment actions against him without either warning him or imposing a probationary period.[10] In short, Wiest has not identified any evidence in the record to connect the investigation—either its initiation or its results—to his protected activity. In turn, Wiest "has produced no evidence casting doubt on the integrity of the investigation" and there is no genuine issue of material fact casting doubt on Tyco's affirmative defense. See Hemphill v. Celanese Corp., 430 F. App'x 341, 345 (5th Cir. 2011).

## V. CONCLUSION

---

[10] We are aware that Tyco has a handbook which provides that it follows "traditional notions of progressive discipline when possible." (App. 848). But the handbook goes on to state that "management reserves the right to discipline or terminate employees without resorting to prior disciplinary measures." Id.

28

For the foregoing reasons, we will affirm the District Court's order for summary judgment entered April 13, 2015.